**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ROBERT L. JARAMILLO, | No. CIV 00-0936-PHX-SMM |
| Petitioner, | **MEMORANDUM OF DECISION AND ORDER** |
| vs. | |
| DORA B. SCHRIRO, et al., | |
| Respondents. | |

Pending before the Court is Petitioner-Appellant's (hereinafter "Appellant") Request for Certificate of Appealability [Doc. No. 205] from the Court's Order dated September 19, 2005 [Doc. No. 189] in which the Court found Petitioner's procedurally defaulted habeas corpus petition must be denied as a matter of law because Petitioner's actual innocence claim failed.

**FACTUAL BACKGROUND**

On January 3, 1984, inmate Don Abeyta was stabbed to death in exercise pen three of Special Management Unit II (SMU II) at the Arizona State Prison Complex, Florence. Petitioner and fellow inmates Lino Flores and Pete Moreno were the only other people present in the exercise pen at the time of the murder. On April 5, 1984, Petitioner, Flores and Moreno accepted a package plea agreement and pled guilty to first degree murder in Pinal County Superior Court for the murder of Don Abeyta. The plea agreement provided for life imprisonment without the possibility of parole for twenty-five years, and removed the possibility of the death penalty.

1    At the change of plea hearing before the Pinal County Superior Court, Petitioner and his co-defendants refused to make any oral statements to the court to form the factual basis of their guilty pleas. Rather, they motioned the court to accept the grand jury transcript and an 89-page packet of information, containing mostly prison incident reports, as the factual basis for their guilty pleas.

The grand jury transcript and packet detailed as follows. [Exh. 84 at C]. On January 3, 1984, Correctional Officer Bobby Warren was the only officer supervising exercise pens three and four, and was situated between the two adjacent pens. Officer Warren observed Petitioner, Flores and Moreno wrestle Abeyta to the concrete floor of exercise pen three. Officer Warren saw Flores restrain Abeyta on the ground by placing him in a headlock, and Moreno holding down Abeyta's legs. Next, Officer Warren observed Petitioner withdraw a shank from Abeyta, and then proceed to stab Abeyta three times. Officer Warren yelled at Petitioner to stop, or he would shoot him. Petitioner stepped away from Abeyta soon after Warren's threat of force. Officer Warren called on his radio for assistance in the exercise pen, and several Correctional Officers arrived at the scene shortly thereafter. Abeyta was transported to Pinal County General Hospital via prison ambulance, where he was pronounced dead. An autopsy conducted the same day by the then Pinal County Medical Examiner, Dr. Thomas E. Henry, revealed Abeyta had been stabbed 19 times, including multiple wounds to the heart, liver, and lungs. [Exh. 1 at 58]. It is undisputed that Officer Warren did not observe the events that led up to the take down of Abeyta. Officer Warren is now deceased.

The Pinal County Superior Court accepted the grand jury transcript and packet as the factual basis for Petitioner's guilty plea which included Officer Warren's report. Petitioner, Flores and Moreno were all subsequently sentenced to life imprisonment without the possibility of parole for twenty-five years, in accordance with the terms of the plea agreement.

Over twelve years after his guilty plea, Petitioner filed a third petition for post-conviction relief in Arizona state court on October 31, 1996, raising a claim of self-defense for the first

time.[1] Specifically, Petitioner claimed that he had uncovered newly discovered evidence in the form of an eyewitness, inmate Wayne Graham, who could corroborate his newly asserted claim of self-defense by establishing that (1) Abeyta was the initial aggressor, (2) Abeyta attacked Petitioner with a shank, (3) Petitioner disarmed Abeyta, and (4) Petitioner stabbed Abeyta in self-defense.

## PROCEDURAL BACKGROUND

On May 16, 2000, Petitioner filed his current petition for writ of habeas corpus asserting that his guilty plea was unlawfully induced and not voluntarily made because the prosecution failed to disclose the existence of Wayne Graham, in violation of <u>Brady</u>. This Court denied Appellant's petition for writ of habeas corpus on December 6, 2001, on the grounds that Appellant's petition was barred by procedural default for failure to exhaust his <u>Brady</u> claim [Doc. No. 12]. On December 18, 2001, this Court denied Appellant's Certificate of Appealability [Doc. No. 15]. On August 13, 2002 the Ninth Circuit granted Appellant a Certificate of Appealability [Doc. No. 18] and appointed counsel for Jaramillo.

On August 20, 2003, the Ninth Circuit Court of Appeals reversed the judgment of this Court and remanded for further proceedings in <u>Jaramillo v. Stewart</u>, 340 F.3d 877 (9th Cir. 2003). The Ninth Circuit held that Petitioner has alleged newly discovered evidence that, if credible, raises a sufficient doubt about his guilt such that he may be "actually innocent" of the charged crime under the standard of <u>Schlup v. Delo</u>, 513 U.S. 298 (1995). Respondents petitioned the Ninth Circuit for rehearing, suggesting a rehearing en banc, which was rejected on October 31, 2003.

Pursuant to the Ninth Circuit Court of Appeals' order in <u>Jaramillo v. Stewart</u>, 340 F.3d 877 (2003), this Court held an evidentiary hearing in this matter on August 16-19, 2005, to determine whether Petitioner's procedurally defaulted habeas corpus claim may be reviewed on the merits under the "actual innocence" exception of <u>Schlup v. Delo</u>, 513 U.S. 298 (1995).

---

[1] The Court notes that at the time of the change of plea, Petitioner waived any and all defenses he could assert including self defense.

On September 19, 2005, this Court issued an Order [Doc. No. 189] denying Appellant's Petition for Writ of Habeas Corpus. After consideration of all the evidence presented at the evidentiary hearing, this Court found that Appellant's procedurally defaulted habeas corpus petition must be denied as a matter of law because Appellant did not produce sufficient evidence of actual innocence to excuse the procedural default. Specifically, the Court found:

(1) neither Wayne Graham nor his affidavit are credible;

(2) Petitioner did not act in self-defense;

(3) Petitioner failed to offer any credible newly presented evidence in support of his actual innocence claim; and

(4) there is overwhelming factual, forensic and circumstantial evidence by which a reasonable jury would find Petitioner guilty of capital first degree murder.

On November 11, 2005, Appellant filed a Request for Certificate of Appealability from the Court's Order dated September 19, 2005 [Doc. No. 189] which is now before the Court [Doc. No. 205].

**STANDARD OF REVIEW**

To issue a Certificate of Appealability, the applicant must make a substantial showing of the denial of a federal Constitutional right. See 28 U.S.C. § 2253(c)(2). A "substantial showing" requires the applicant demonstrate "that reasonable jurists could debate whether ... the petition should have been resolved in a different manner or the issues presented were adequate to deserve encouragement and proceed further." Slack v. McDaniel, 529 U.S. 473, 475 (2000).

**DISCUSSION**

Appellant seeks review of the judgment, findings and holdings set forth in the Court's Memorandum of Decision and Order (the "Order") dated September 19, 2005 [Doc. No. 189]. Appellant contends that "[j]urists of reason would find that Jaramillo's Petition States a Valid Claim of the denial of a Constitutional right" and that "[j]urists of reason would find it debatable whether the Court was correct in dismissing Jaramillo's petition based on his procedural default." Specifically, Petitioner argues:

- 4 -

1) Reasonable jurists could conclude that the Court applied an incorrect legal standard;

2) Reasonable jurists could conclude that the Court abused its discretion in denying Jarmillo's request to conduct additional discovery;

3) Reasonable jurists could conclude that the Court deprived Jaramillo of his rights under the Confrontation Clause;

4) Reasonable jurists could conclude that the Court should have applied the principles set forth in Crawford v. Washington, 541 U.S. 36 (2004) in this proceeding;

5) Reasonable jurists could conclude that the Court erred in drawing an adverse inference from Graham's invocation of his Fifth Amendment Privilege;

6) Reasonable jurists could conclude that the Court erred in rejecting the connection between Abeyta's glove and the shank; and

7) Reasonable jurists could conclude that Jaramillo established a valid claim of self-defense.

In Jaramillo, the Ninth Circuit considered the issue of "whether Jaramillo's claim of actual innocence is sufficient to require a hearing before the district court to determine whether the facts justify consideration of the merits of the constitutional claim, despite the procedural default." Jaramillo, 340 F.3d at 878. Citing Graham's undisclosed testimony and the autopsy report,[2] the Ninth Circuit answered this query in the affirmative and remanded the case, so this Court could conduct an evidentiary hearing. In Jaramillo, the Ninth Circuit also identified the principal purpose of the evidentiary hearing as the determination of the credibility of the proffered evidence, in particular Graham's affidavit.[3]

---

[2] The Ninth Circuit stated: "Jaramillo has presented sufficient evidence, if credible, to support a finding that he is actually innocent of first degree murder. Foremost is the previously undisclosed testimony of Graham, who provided a declaration stating that Abeyta initiated the attack, that Jaramillo wrested the shank from Abeyta, and that he stabbed Abeyta in self-defense. The second item of proof offered is the autopsy report." Jarmillo, 340 F.3d at 883.

[3] The Ninth Circuit stated "There remains a question of the credibility of the proffered evidence. . . . A remand for an evidentiary hearing would allow the parties to develop the factual record . . . . The district court is in the best position to observe the witnesses, including Graham . . . under cross-examination, together with the other evidence available, and to make the ultimate credibility determinations." Id.

- 5 -

## *I. Incorrect Legal Standard*

Petitioner contends that the Court applied the incorrect legal standard. In support of this assertion, Petitioner argues that because the Court stated that Petitioner failed to establish that "a reasonable juror would have found him innocent of capital first-degree murder" the Court applied the wrong standard.

The Court, however, finds that it was both aware of, and applied the correct standard in the evidentiary hearing. While Petitioner correctly points out that the Court used the words "found him innocent," he fails to acknowledge that on page 5 of the Court's Opinion the Court set forth the Standard of Review it applied in evaluating Petitioner's claims.[4] The Court also notes that both the United States Supreme Court and the Ninth Circuit have used the phrase "actual innocence" without clarifying the term with a discussion of the proper burden of proof at a criminal trial. See Bousely v. United States, 523 U.S. 614, 623 (1998) (stating "'actual innocence' means factual innocence, not mere legal insufficiency."); Jaramillo, 340 F.3d at 883 (stating "this justifies a hearing to determine whether Jaramillo has produced sufficient evidence of 'actual innocence'").

Accordingly, the Court finds Petitioner has failed to demonstrate reasonable jurists could debate whether the Court applied an incorrect legal standard based on Petitioner's parsing of the language employed by the Court in its Order dated September 19, 2005.

---

[4] In its Order dated September 19, 2005, the Court stated: "To establish actual innocence, petitioner must demonstrate that, in the light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." Bousley v. United States, 523 U.S. 614, 623 (1998); see also Schlup v. Delo, 513 U.S. 298 (1995) ("a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt"). "[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S. at 329. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." Bousley, 523 U.S. at 623. "To be credible, [an actual innocence] claim requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup, 513 U.S. at 324; see also Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003) ("we hold that habeas petitioners may pass Schlup's test by offering 'newly presented' evidence of actual innocence").

## *II. Additional Discovery*

Petitioner contends that reasonable jurists could conclude that the Court abused its discretion in denying his request to conduct additional discovery.

Significantly, the Court finds that the Order that is the subject of this application for a Certificate of Appealability did not address any discovery matters and was limited to the Court's findings based on the evidentiary hearing to evaluate Petitioner's evidence proffered in support of his actual innocence claim. Accordingly, the Court finds that Petitioner appears to be requesting a Certificate of Appealability from a ruling or finding the Court did not make in its Order.

This notwithstanding, the Court will briefly address Petitioner's assertion that it improperly denied his request for a discovery extension. Petitioner presented his extension request to the Court on July 6, 2005, the deadline for all motions in this matter and a month and ten days before the evidentiary hearing was scheduled. As the Court noted in its Order dated July 26, 2005, Petitioner was aware of the alleged deficiencies in the documents he received as early as February 8, 2005 and no later than April 25, 2005. Petitioner attempts to justify his eleventh hour extension request by pointing to the meet and confer provisions of FRCP 37(a)(2) and alleging that the Department of Corrections purposefully delayed and then denied his request for the documents. The Court, however, made it very clear in its Order dated May 10, 2005, that "absent an extraordinary showing of need, Petitioner, and Respondents, shall not be given the opportunity to further amend their witness or **otherwise conduct untimely discovery**." (emphasis added). In its Order dated July 26, 2005, the Court also found that Petitioner failed to specify the relevance of his additional discovery requests and was seeking information that was collateral to his claim of self defense. Accordingly, the Court finds that Petitioner was aware of the Court's reluctance to grant last-minute extensions for almost two months before he filed his last-minute extension request on the day of the final motion deadline (which had been set after numerous extensions had previously been granted).

- 7 -

Thus, the Court finds that Petitioner has failed to demonstrate reasonable jurists could debate whether the Court abused its discretion in denying his request to conduct additional discovery.

### *III. Confrontation Clause/Crawford Claim*

Petitioner also argues that reasonable jurists could conclude that the Court deprived him of his rights under the Confrontation Clause by failing to strike the report of Bobby Warren and that Crawford v. Washington, 541 U.S. 36 (2004) should have been applied to Petitioner's habeas claim.

Initially, the Court notes that the issues of the application of Crawford (as it had not yet been decided) or Petitioner's Sixth Amendment right were not before the Ninth Circuit. Likewise, the Court did not address these issues in the Order that is the subject of the request for a Certificate of Appealability currently before the Court as that Order addressed this Court's findings after the Evidentiary Hearing conducted pursuant to the instructions from the Ninth Circuit. Furthermore, Petitioner essentially concedes that these issues are not properly before the Court by requesting the Court to allow Petitioner to side-step the proper procedural avenues for litigating any potential Crawford claims.[5]

These procedural hurdles notwithstanding, the Court also notes that Petitioner waived his confrontation clause rights when he pled guilty in Pinal County Superior Court. United States v. Mezzanatto, 513 U.S. 196, 201, 115 S.Ct. 797, 801 (1995) (citing Boykin v. Alabama, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712 (1969)). The record reveals that Petitioner filed a motion with that court to have the grand jury transcript and 89-page packet (that contained Officer Warren's report) constitute the factual basis for his guilty plea. The Court further finds, as it did in its Order dated August 5, 2005, that: 1) Petitioner signed his initials on the motion to have these documents form the factual basis of his guilty plea; 2) Petitioner confirmed to the

---

[5] Petitioner contends that the "Court arguably had an equitable basis for extending the Confrontation Clause to this proceeding" based on the Ninth Circuit's ruling in Bockington v. Bayer, 399 F.3d 1010, 1016 (9th Cir. 2005) and requests the Court to consider these claims now rather than require Petitioner to amend his habeas petition to include a Crawford claim.

court that he initialed the motion; 3) Petitioner avowed to the court that he had reviewed all of the documents and knew their contents; 4) Petitioner's attorney confirmed that Petitioner had reviewed the documents in his presence; and 5) the court repeatedly confirmed with Petitioner that his intent was to have these documents serve as the factual basis of his guilty plea. [Ex. 84]. Accordingly, the Court finds that Petitioner knowingly and intelligently waived his rights under the Sixth Amendment to confront his accuser.

The Court also notes, as it did in its prior Order, that this is a civil habeas corpus proceeding and the Confrontation Clause of the Sixth Amendment applies to criminal prosecutions; therefore, the Confrontation Clause is inapplicable to this civil habeas corpus proceeding. Petitioner, however, argues that the Court should have applied the Sixth Amendment to the evidentiary hearing based on the Supreme Court's language in O'Neal v. McAnich, 513 U.S. 432, 115 S.Ct. 992 (1995). In deciding to apply the more protective rules governing the burden of persuasion regarding harmless error, the Supreme Court noted that: "[u]nlike the civil cases cited by the State, the errors being considered by a habeas court occurred in a criminal proceeding and therefore although a habeas is a civil proceeding, someone's custody, rather than mere civil liability, is at stake." Id. at 440. The Supreme Court, however, was addressing an error that had occurred during the petitioner's criminal trial. Here, Petitioner is alleging that the Court committed an error when it failed to strike a report from a civil habeas evidentiary hearing. Significantly, Petitioner did not, and could not allege that error occurred during his trial as Petitioner did not stand trial.

Thus, the Court finds Petitioner's reliance on O'Neal is misplaced and also finds that Petitioner has failed to demonstrate reasonable jurists could debate it was an error to decline to apply Crawford to the Evidentiary Hearing.

### *IV. Adverse Inference from Graham's Invocation of his Fifth Amendment Privilege*

Petitioner concedes and the Court finds that the primary reason for the evidentiary

- 9 -

hearing was to evaluate the credibility of Wayne Graham.[6] Accordingly, Graham was brought to the Sandra Day O'Connor United States Courthouse in Phoenix, Arizona on August 16, 2005, from his place of incarceration at the Oklahoma State Penitentiary in McAlester, Oklahoma. Upon arrival, Graham informed Petitioner's counsel that he would be invoking his Fifth Amendment privilege against self-incrimination, and therefore would not testify at the evidentiary hearing.

At the hearing, the Court appointed independent counsel to represent and confer with Graham regarding his rumored invocation of the Fifth Amendment. The Court then proceeded to call Graham to the witness stand where he formally invoked the Fifth Amendment. In accordance with Hoffman v. United States, 341 U.S. 479 (1951) and United States v. Neff, 615 F.2d 1235 (9th Cir. 1980), the Court determined that given the "peculiarities of the case," a real and appreciable danger of incrimination plausibly existed in the form of perjury, and therefore Graham was not required to establish the validity of the privilege.

In an abundance of caution, the Court recalled Graham and his attorney on August 18, 2005, to confirm that the invocation of the privilege was done knowingly and voluntarily. Additionally, the Court inquired as to whether Graham had received any threats, to which Graham answered no. Graham satisfied the Court that his invocation was proper under controlling law, and he was subsequently excused as a witness.

In determining that a real and appreciable danger of incrimination plausibly existed in the form of perjury, the Court also considered and foreclosed the possibility that Graham's testimony would somehow implicate him in the murder of Abeyta. In its Order dated September 19, 2005, the Court found that there was simply no evidence to support the belief that Graham was somehow involved in the murder, and therefore invoked the Fifth Amendment on that

---

[6] Citing Graham's affidavit, in Jaramillo v. Stewart, 340 F.3d 877 (9th Cir. 2003), the Ninth Circuit stated: "Jaramillo has presented sufficient evidence, if credible, to support a finding that he is actually innocent of first degree murder. Foremost is the previously undisclosed testimony of Graham, who provided a declaration stating that Abeyta initiated the attack, that Jaramillo wrested the shank from Abeyta, and that he stabbed Abeyta in self-defense." Id. at 883.

ground and then concluded that the only apparent legitimate grounds for invocation of the privilege was perjury.

The Court also found that Graham's refusal to testify is significant for several reasons, including in no small measure the fact that his absence denied this Court the ability to evaluate his credibility under the crucible of cross-examination, which was specifically identified by the Ninth Circuit as a central purpose of the evidentiary hearing. Jaramillo, 340 F.3d at 883. Accordingly, given the import ascribed to Graham's testimony by the Ninth Circuit, the Court found that the purpose of the hearing was substantially frustrated by Graham's refusal to testify.

The Court also found that Graham's invocation of the Fifth Amendment permitted the Court to draw an adverse inference, which the Court elected to do. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976); Keating v. Office of Thrift Supervision, 45 F.3d 322, 326 (9th Cir. 1995) ("it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding"). Therefore, the Court inferred that it was likely Graham invoked the privilege because his affidavit is false and he would have (1) committed perjury by testifying to the truth of the affidavit, or (2) confessed to perjury by testifying to the falsity of the affidavit, which was sworn and taken under oath and then concluded that Graham's credibility was undermined by his invocation of the Fifth Amendment privilege.

After Graham refused to testify, the Court admitted into evidence his affidavit and deposition and evaluated the credibility of these respective documents. The Court found that Graham's declaration and deposition are inconsistent with Petitioner's testimony because Graham stated Flores was the one who discovered that he was a witness and asked him to draft the affidavit, whereas Petitioner asserts that he was the one who in fact discovered Graham and asked him to draft the affidavit. The Court also found that the close proximity of Graham to Petitioner and his co-defendants on at least four separate occasions between 1987 and 1995 raised questions as to: 1) why Graham did not come forward as a witness sooner and 2) increased the likelihood that Graham's role as an eyewitness was concocted.

The Court also found that Graham was never interviewed in connection with Abeyta's murder despite his claim to the contrary based on the testimony of Joseph Savalas, the Arizona

Department of Corrections' case investigator for the murder of Abeyta. This finding is significant for two reasons: 1) Graham's claim that he was interviewed is at the heart of Petitioner's Brady claim, as Petitioner asserts that the prosecution withheld exculpatory evidence, namely Graham's existence and 2) Graham's failure to tell the truth about being interviewed in conjunction with the Abeyta murder investigation is further evidence that his affidavit lacks veracity.

The Court also made several other credibility findings including that: 1) Graham claimed to be in exercise pen four at the time of the murder with three other inmates, including Billy Owens, who, according to evidence produced at the hearing, was not in the custody of the Arizona Department of Corrections on January 3, 1984; 2) Graham has previously been convicted of aggravated assault, reckless endangerment, and burglary; 3) Graham's prior lawsuit against the Arizona Department of Corrections indicates that he may be biased against the Department; and 4) Graham did not mention either Flores or Moreno in the affidavit, despite previously claiming that Flores asked him to draft an affidavit.

Accordingly, the Court finds that Petitioner has failed to demonstrate reasonable jurists could debate whether the Court erred in drawing an adverse inference from Graham's invocation of his Fifth Amendment Privilege.

*V. The Glove*

Petitioner also argues that reasonable jurists could conclude that the Court erred in rejecting the connection between Abeyta's glove and the shank because the Court based its conclusion on a finding that Petitioner was the initial aggressor.

Petitioner fails to recognize that Court (appreciating the importance of the glove given the Ninth Circuit's specific citation to the glove on Abeyta's right hand as a circumstantial factor evidencing the validity of Petitioner's self-defense claim[7]) considered all of the evidence presented including but not limited to the autopsy report and the testimony of Officer Baugher, Officer Edwards, Doctor Henry, and Doctor Keen (all of whom the Court found were credible).

---

[7] Jaramillo, 340 F.3d at 883.

1    After considering all of the evidence, the Court found that: 1) there is simply no evidence indicating that the material used for the shank handle was in any way associated with or derived from the black bandana found wrapped around Abeyta's glove, nor was there a showing that any material was missing from the black bandana; 2) the Petitioner was the initial aggressor and 3) Abeyta most likely wore the glove for some sort of recreational purpose, namely, either for handball or lifting weights. Based on these findings, the Court concluded there was no evidence to substantiate a connection between the glove and the shank. Thus, the Court finds that Petitioner has failed to demonstrate reasonable jurists could debate whether the Court erred in finding that the glove did not indicate that Abeyta was the initial aggressor.

### *VI. Self Defense*

Petitioner also contends that the Court treated the fact that Abeyta was stabbed nineteen times as conclusive proof that Petitioner did not have a valid claim of self-defense and is a point upon which reasonable jurists could differ. In support of this contention, Petitioner relies on a case from the D.C. Circuit for the proposition that "the claim of self-defense is not necessarily defeated because the defendant, acting in the heat of passion brought on by an assault, use more force than would have seemed necessary to a calmer mind." Perry v. United States, 422 F.2d 697, 700 (D.C. Cir. 1969). Petitioner contends that because jurists on the Court of Appeals applied this principle a debate exists as to whether the principle applies here. The Court, however, finds Petitioner's reliance on Perry is misplaced. In Perry, the Court merely found that jury should have been informed of this principle so as to aid the jury in their deliberations. Furthermore, the Court did not find that use of excessive force cannot defeat a claim of self defense but stated such a claim "is not necessarily defeated." Id.

Under Arizona law, Petitioner's right to use force in self-defense ends when the threat of physical harm is no longer imminent. State v. Reid, 747 P.2d 789, 791 (1989). Furthermore, under Arizona law, Petitioner must prove that a reasonable person would believe deadly force was necessary to protect himself or others from the use or attempted use of unlawful deadly force. State v. Leonardo, 776 P.2d 789, 791 (1989); A.R.S. § 13-405(2).

Applying these principles, the Court found that no reasonable person could find that Petitioner had an immediate necessity to stab Abeyta 19 times to protect himself. Contrary to Petitioner's assertion, the Court did not base its finding that Petitioner failed to establish a valid claim of self defense solely on the fact Petitioner stabbed Abeyta 19 times. Rather, in addition to finding that this fact rendered Petitioner's self defense claim untenable under Arizona law, the Court went on to find the following: 1) Abeyta was the last individual introduced to the pen and therefore was the least likely to have introduced the shank; 2) the failure of Petitioner or either of his co-defendant's to call for help during the attack is not consistent with Petitioner's claim that Abeyta was the aggressor; and 3) Petitioner admitted during cross examination that he could have stood up and walked away and could have thrown the shank on the roof at any point during the altercation.

At the Evidentiary Hearing, Dr. Henry and Dr. Keen offered the following expert medical testimony:  1) that many of the stab wounds to Abeyta hit vital organs, causing a significant loss of blood thereby conclusively rendering Abeyta incapable of offering resistance or continuing to threaten Petitioner; 2) the numerous injuries Abeyta sustained to the chest and abdomen and the lack of defensive wounds on Abeyta's arms were consistent with Abeyta being restrained during the attack and were entirely inconsistent with Abeyta being the aggressor; and 3) the blood stain on the front of Flores' (one of Petitioner's co-defendants) was consistent with Flores holding Abeyta from behind and pressing his chest against the wound to Abeyta's back.

At the Evidentiary Hearing, the Court was presented with not only substantial circumstantial evidence but expert medical testimony that the medical evidence conclusively established that Abeyta was not the aggressor and that Petitioner did not act in self defense. Based on this evidence, the Court concluded in its September 19, 2005 Order, and concludes now, that the evidence presented at the Evidentiary Hearing overwhelmingly and conclusively establishes that Petitioner did not act in self defense. Morever, a separate panel of the Ninth Circuit Court of Appeals which reviewed one of Petitioner's co-defendant's claim of self defense, relied on evidence that Abeyta was stabbed nineteen times in finding

that Graham's testimony would have only supported a unviable self defense claim. <u>Flores v. Stewart</u>, 52 Fed. Appx. 924 (9th Cir. 2002).[8] The Court also finds the fact that Graham's affidavit and deposition inexplicably contradict overwhelming and conclusive circumstantial and physical evidence remarkable and a further indication that Graham is not credible.

Accordingly, the Court finds that Petitioner has failed to demonstrate reasonable jurists could debate its conclusion that Petitioner failed to establish a valid claim for self defense.

**CONCLUSION**

The Court finds that Petitioner has failed to make a substantial showing of the denial of a federal Constitutional right by demonstrating reasonable jurists would disagree with the Court's findings that Petitioner failed to offer any new and reliable evidence of actual innocence and that there has been no fundamental miscarriage of justice here entitling Petitioner to pass through the actual innocence gateway of <u>Schlup v. Delo</u>, 513 U.S. 298 (1995). Accordingly,

**IT IS THEREFORE ORDERED** that Petitioner's Request for a Certificate of Appealability [Doc. No. 205], is hereby **DENIED**.

**IT IS FURTHER ORDERED** this matter is hereby terminated.

DATED this 17th day of February, 2006.

_____
Stephen M. McNamee
Chief United States District Judge

---

[8] The Court only cites <u>Flores</u> as a further indication of the implausibility of Petitioner's self defense claim and not for any precedential value.

- 15 -